**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GARY TALBOT ) | |
| 15 North Trail ) | |
| Wilmington, DE 19810, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil Action No.:** _____ |
| ) | |
| NATIONAL RAILROAD PASSENGER ) | |
| CORPORATION (AMTRAK) ) | |
| 1 Massachusetts Avenue, N.W. ) | |
| Washington, D.C. 20001, ) | **JURY TRIAL DEMANDED** |
| ) | |
| Registered Agent: ) | |
| CT Corporation ) | |
| 1015 15ᵗʰ Street, N.W. ) | |
| Suite 1000 ) | |
| Washington, D.C. 20005, ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT OF WHISTLEBLOWER RETALIATION
UNDER THE NATIONAL DEFENSE AUTHORIZATION ACT (FISCAL YEAR 2013)
AND THE AMERICAN RECOVERY AND REINVESTMENT ACT**

1. Plaintiff Gary Talbot has been a staunch advocate for the disability community ever since a horrific car accident left him wheelchair bound on October 4, 1980. His years of advocacy led him, in 2011, to become the Americans with Disabilities Act (ADA) Program Manager for Defendant National Railroad Passenger Corporation (d/b/a Amtrak). Mr. Talbot envisioned a transformed railway system that allows disabled persons to enjoy the same services as everyone else—that is, a transit system that is fully compliant with the ADA.

2. Amtrak did not share the same vision. Methodically, Amtrak intensified its retaliation against Mr. Talbot by demoting him, issuing him two negative performance appraisals,

placing him on two Performance Improvement Plans (PIPs), creating a hostile work environment, and finally removing him while he was on medical leave. Amtrak's actions, taken by various executives and other high-level managers, violated multiple statutes.

3. Accordingly, Mr. Talbot brings this action under the National Defense Authorization Act for Fiscal Year 2013 (NDAA), as amended, 41 U.S.C. § 4712, and the American Recovery and Reinvestment Act (ARRA or Stimulus Act), Pub. L. No. 111-5, 123 Stat. 297–99 (2009), to recover all damages and other remedies available to him.

## PARTIES

4. Gary Talbot is a citizen of the United States and a resident of Delaware.

5. For almost the entirety of his professional life, Mr. Talbot devoted himself to improving accessibility for persons with disabilities and to ensuring public and private compliance with the ADA.[1] While enrolled at the University of Michigan—where he graduated with a Bachelor of Science in Mechanical Engineering—Mr. Talbot worked with his university to improve accessibility for students with disabilities. After his graduation, Mr. Talbot enjoyed a productive and successful career in the private sector as the Engineering Group Manager for General Motors and a Senior Project Engineer for Disney, where he was responsible for improving accessibility in the fleet (at GM) and at all parks, resorts, and other attractions (at Disney).  Additionally, Mr. Talbot was the first ever Assistant General Manager for System-wide Accessibility at the Massachusetts Bay Transportation Authority and he served two terms as a Presidential Appointee to the U.S. Access Board, a federal agency tasked with promoting equality for persons with disabilities. He has

---

[1] For a brief summary of some of Mr. Talbot's contributions, see
http://www.cnn.com/2010/LIVING/07/26/ada.talbot/index.html.

served as an expert witness in multiple federal lawsuits alleging violations of the ADA
and other laws aimed at increasing accessibility and equality for persons with disabilities.

6.  Mr. Talbot joined Amtrak on September 5, 2011, where he oversaw Amtrak's ADA
Program as the Program Director until his demotion in October 2016.

7.  Throughout his tenure, Mr. Talbot was a non-voting member of the Amtrak Executive
Oversight Committee (EOC)[2]—also referred to as the ADA Management Team—which
"provides senior management oversight of [Amtrak's] ADA program." *Train Operations
and Business Management: Addressing Management Weaknesses Is Key to Enhancing
the Americans with Disabilities Program*, Audit Report OIG-A-2014-010, August 4,
2014, https://amtrakoig.gov/sites/default/files/reports/audit_report_oig-a-2014-010.pdf.

8.  On January 25, 2018, Amtrak removed Mr. Talbot while he was using FMLA leave,
purportedly because his position was no longer available. However, Amtrak announced
his position less than three months after he was ousted.

9.  Defendant National Railroad Passenger Corporation, d/b/a Amtrak, is a federally-
chartered corporation created by an Act of Congress in 1970. Amtrak serves an average

---

[2] The EOC has changed members over time. From September 2011, the EOC was comprised of
Joseph McHugh, Chair of the EOC and Vice President of Government Affairs and
Communications, DJ Stadtler, Executive Vice President/Chief Operations Officer, Stephen J.
Gardner, Executive Vice President of Planning, Technology and Public Affairs, Eleanor D.
Acheson, the Executive Vice President, Corporate Secretary, Chief Legal Officer and General
Counsel, Matthew Hardison, Executive Vice President/Chief Marketing and Sales Officer,
William Herrmann, Managing Deputy General Counsel, Joseph Rago, Senior Director –
Engineering Construction, Matthew Gagnon, Senior Director of Amtrak Controls, Melantha
Paige, Senior Amtrak Controls Consultant, Peggy Reid, Chief of Staff, and Gary Talbot, ADA
Program Director.

In 2016, Mr. Stadtler became the Chair of the EOC. In 2017, Mr. Stadtler took over Mr. Talbot's
responsibilities for setting the agenda.

of 85,700 passengers on a daily basis throughout the contiguous United States. By statute,

its principal office and place of business are located in Washington, D.C. 49 U.S.C.

§ 24301(b). It is headquartered at Union Station, 1 Massachusetts Avenue, N.W.,

Washington, D.C. 20001.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331, 41 U.S.C. §
    4712(c)(2), and ARRA, § 1553(c)(3).

11. This Court has personal jurisdiction over Defendant because the Defendant is
    headquartered in and transacts business in the District of Columbia.  Fed. R. Civ. P.
    4(k)(1)(A).

12. This Court is the proper venue pursuant to 28 U.S.C. § 1391. Defendant Amtrak is
    headquartered in and transacts business in the District of Columbia, Amtrak hired Mr.
    Talbot, in part, to perform duties in the District of Columbia, and a substantial part of the
    events giving rise to his claim of reprisal occurred in the District of Columbia.

13. Finally, Mr. Talbot has exhausted his administrative remedies as required by 41 U.S.C. §
    4712(c)(2) and ARRA, § 1553(c)(3).  He filed his complaint on July 27, 2018.  Thus, the
    210-day exhaustion period expired on February 22, 2019.


## BACKGROUND

**A.  The Bases for Some of Mr. Talbot's Protected Disclosures and Oppositional
    Activities: Amtrak's Obligations Under the Americans with Disabilities Act, the
    American Recovery and Reinvestment Act of 2009, and the False Claims Act**

14. On July 26, 1990, Congress enacted the Americans with Disabilities Act (ADA). Title II

    of the ADA required Amtrak, among other public entities, to overhaul its existing

4

stations, vehicles, and rail systems to be readily accessible and useable by individuals with disabilities.[3] 42 U.S.C. § 12131 *et seq.* In particular, "[a]ll stations in the intercity rail transportation system shall be made readily accessible to and useable by individuals with disabilities" by July 26, 2010. 42 U.S.C. § 12162(e)(2)(A)(ii)(1); 49 C.F.R. § 37.55.

15. Over the subsequent twenty years, Amtrak made dismal progress. In approximately 2009, Amtrak finally—and belatedly—introduced the Mobility First program in an attempt to compensate for its past failures. Mobility First's stated objective was to improve basic accessibility at stations nationwide that previously were unavailable to persons with disabilities.

16. Amtrak also introduced[4] the Accessible Stations Development Program (ASDP) in or around 2010.[5] The ASDP was created to bring all stations into complete ADA compliance. Originally projected by Amtrak as a five-year program, the ASDP has been extended (and remains ongoing to this day).

17. Both Mobility First and ASDP received $144 million in funding from the American Recovery and Reinvestment Act of 2009 (ARRA or Stimulus Act).

18. In addition, beginning in 2010 (and through the present), Congress mandated that Amtrak devote $50 million of its general capital grant per fiscal year to "bring Amtrak served facilities and stations into compliance with the Americans with Disabilities Act[.]" CONSOLIDATED APPROPRIATIONS ACT, 2017, PL 115-31, May 5, 2017, 131 Stat

---

[3] New stations, vehicles, and systems must be built to be accessible. 42 U.S.C. § 12162(e)(1).
[4] Amtrak already had a program in place called the Amtrak Stations Development Program (ASDP).

[5] ASDP was re-named ADA Stations Program (ADASP) in approximately 2014, but the objectives of the program did not change.

135; *see also* Federal Railroad Administration, *FRA Top Policy Issues*, U.S. Department of Transportation, https://cms.dot.gov/transition/fra-top-policy-issues (last updated April 28, 2017) ("Since FY 2010, Congress has required Amtrak to direct at least $50 million of its annual federal funds to improve station accessibility.")

**B. Amtrak's Reporting Obligations**

19. The United States Department of Transportation (DOT) and its sub-Agency, the Federal Railroad Administration (FRA), are responsible for overseeing Amtrak's use of the federal funds and ensuring that Amtrak complies with the statutory requirements.

20. The ARRA, also known as the Stimulus Act, included provisions to ensure that the millions of dollars in federal funds issued to Amtrak pursuant to grant agreements were spent with accountability and used as directed.

21. The FCA provides, in pertinent part, that:

> any person who— (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); …
>
> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;
> …
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government ….
>
> (b) For purposes of this section— (1) the terms "knowing" and "knowingly"— (A) mean that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or  (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729.

22. Mr. Talbot believed (and disclosed) that Amtrak misused the federal funds earmarked for ADA projects, primarily by: 1) expending funds on State of Good Repair (SOGR) work, which often was not necessary to bring a specific element into compliance with the ADA or had little to no bearing on increasing accessibility; 2) using the ASDP budget and resources to re-do work that had been recently completed under the Mobility First program that was either non-compliant with the ADA or replaced for non-ADA related reasons, resulting in a waste of more than $10,000,000; 3) misclassifying flag stops that functioned as standard stops;[6] 4) using the 1991 ADA Department of Transportation Accessibility Standards (DOTAS) as the enforceable ADA standard for renovations and new work completed between approximately 2009 to 2015, after the adoption of an updated 2006 ADA DOTAS; 5) failing to construct required level boarding[7] and instead frequently designing and constructing low level platforms in violation of ADA DOTAS; and 6) upgrading approximately 12 small passenger shelters (similar to bus stop shelters) with large brick and mortar station structures with ADA funds.

---

[6] Flag stop stations are small stations where trains typically do not stop unless specifically requested.  Due to their infrequent use, they are exempt from ADA requirements.

[7] Level boarding requires the station platform to be level to the interior of the train, thereby allowing passengers in wheelchairs to easily board or disembark without special assistance. The U.S. Access Board issued a report on the importance of level boarding for achieving accessibility: "Full length level boarding should be the highest priority and most preferred method of boarding on all rail modes, whether light rail, rapid rail, intercity rail, and/or commuter rail." *Boarding and Alighting Subcommittee Report*, United States Access Board (February 2015), https://www.access-board.gov/attachments/article/1633/boarding_alighting_report_2015-02-17.pdf.

23. Mr. Talbot reported that, as of his termination, Amtrak had only brought approximately two stations into full compliance with the ADA, despite having spent approximately $494 million.

24. Mr. Talbot regularly reported Amtrak's violations to, *inter alia*, U.S. Department of Transportation Senior Advisor for Accessible Transportation Richard Devylder, Special Assistant to the President and Associate Director of Public Engagement Kareem Dale, Amtrak OIG, and the NDRN.

25. Between 2011 and 2014, Mr. Talbot also concurrently made reports to his then direct supervisor, Joseph McHugh, Vice President of Government Affairs and Corporate Communications and Chair of the Executive Oversight Committee.

26. After he was transferred to the Engineering Department effective September 1, 2014, Mr. Talbot continued to make reports to his new direct supervisor, Joseph Rago, Deputy Chief Engineer-Construction, and his new Executive, Rodrigo Bitar, Chief Engineer.

27. Even after his demotion in October 2016, Mr. Talbot continued to make reports to Mr. Bitar, Ray Verrelle, the new Deputy Chief Engineer-Construction, and Lonnie Murray, the new ADA Program Director.

28. On multiple occasions, Mr. Talbot made disclosures of ADA non-compliance, inappropriate SOGR spending and other ADA compliance problems directly to the CEO and President Joseph H. Boardman and other senior Amtrak executives.

29. In addition, he regularly discussed Amtrak's ADA violations, including misappropriation of funds and ADA budget spending, during EOC meetings.

30. Mr. Talbot faced immense and concerted resistance to his disclosures within Amtrak, and because of his efforts, his superiors issued him two negative performance appraisals,

placed him on two Performance Improvement Plans (PIPs), demoted him, isolated,

disparaged, and harassed him, and, effective January 25, 2018, terminated him.

## STATEMENT OF FACTS

31. Even before Mr. Talbot's official start date of September 5, 2011 as Amtrak's Program

Director for ADA, he observed troubling indicators of noncompliance.

32. Specifically, in or about July 2011, while traveling from Providence, Rhode Island to

Washington, D.C. for a U.S. Access Board meeting and an Amtrak Board meeting,[8] Mr.

Talbot discovered that approximately half of the Providence station platform boasted

brand new level boarding even though the entire existing structure was already a level

boarding platform. This meant that the platform upgrade was considered SOGR work,

which exemplified the improper diversion of ADA funds for regular maintenance. The

Providence platform budget was approximately $2.9 million and it was inappropriately

charged to Amtrak's ADA program.

33. Mr. Talbot disclosed his observation to Amtrak's Senior Director–Engineering

Construction Joseph Rago,[9] who told him that ADA paid for the SOGR work at

Providence, RI.

---

[8] Mr. Talbot understood that he was to regularly report to the Amtrak Board. During his
introductory presentation at the July 2011 Board Meeting, Mr. Talbot explained that his
approach as the new Program Director ADA will be on exploring why Amtrak has been so
unsuccessful in becoming compliant with the ADA. Thereafter, Mr. Talbot was never permitted
to present to the Amtrak Board of Directors again.

[9] Mr. Rago was the Senior Director Engineering Structures and responsible for the ADA
program prior to Mr. Talbot. He was responsible for the ADA budget from approximately 2008
to 2014. Mr. Rago would later become the Deputy Chief Engineer-Construction and Mr. Talbot's
direct supervisor in September 2014.

34. Mr. Talbot explained to Mr. Rago that using ADA funds on SOGR work was wholly inappropriate, because while it increases the value of the station for Amtrak, it does nothing to increase accessibility for persons with disabilities.

35. Mr. Rago responded, "It's going to be real interesting seeing if Amtrak will listen to you when you get here. Amtrak has its own ideas of how the ADA budget can be spent."

36. When Mr. Talbot countered that "this is why I'm coming here so I can help change what needs to be changed," Mr. Rago stared at him and laughed.

37. On his first day, Mr. Talbot observed that the fourth floor of his office at the 30th Street Station had doors that were not ADA-compliant: they were less than 30 inches wide (too narrow) and as a result required both doors to be open at once before he could get his wheelchair through the door opening. Moreover, the doors were manual, and did not have a power door opener. Additionally, Mr. Talbot discovered that the doors to the men's room on the fourth floor had excessive opening force (i.e., door opener was too stiff) well beyond the maximum allowable door force (5 lbs.),[10] had a too-high threshold, and a too-small accessible stall. This problem was widespread throughout Amtrak, including at the Amtrak Headquarters and the Government Affairs office in Washington, D.C., where the EOC meetings were held.

38. From September 2011 to early 2017, Mr. Talbot repeatedly raised the non-compliant door issue at the 30th Street Station offices and 60 Mass Ave., Washington, D.C. to Joe McHugh, Rodrigo Bitar, Joe Rago, Ray Verrelle, and other EOC members.

---

[10] When the door force is excessive it must be reduced even if a power door operator is provided.

39. Repeatedly, the Amtrak executives either swiftly changed the topic or advised him that if he did not have the ADA budget to bring employee areas into compliance that Amtrak would not devote any additional resources to do so.

40. Mr. Talbot reminded his supervisors and EOC members that the ADA budget could only be spent on increasing accessibility for intercity rail service, and it could not be spent on employee-only areas, to no avail.

41. One of Mr. Talbot's first tasks centered on collecting and analyzing data aimed at identifying which stations had been worked on to date, which stations were currently being worked on, which were on the horizon, and what Amtrak's established ADA priorities were.

42. Mr. Talbot researched how Amtrak disposed of the $144 million ARRA ADA-fund and the $50 million Amtrak general capital fund specifically designated for ADA compliance work.

43. In particular, Mr. Talbot focused on Amtrak's Engineering Department, which was responsible for managing the ADA program and all associated ADA budgets, and which had expended multiple millions with minimal to no progress towards enhancing the accessibility of Amtrak stations.

44. In or about September 2011, Mr. Talbot met with Senator Harken's Chief of Staff for Transportation Lee Pursley and his Chief of Staff for Health and Human Services Andy Imparato (who was also knowledgeable about transportation issues) to explain the current state of accessibility at Amtrak and the little progress that had been made on ADA work or compliance over the past 21 years. Francis Bourne, Amtrak's Senior Director for

Interdepartmental Affairs and Eleanor (Eldie) Acheson, Amtrak's General Counsel and
Secretary, were also present during the initial meeting with Senator Harken's staff.

45. After meeting with Senator Harken's office, Mr. Talbot debriefed Mr. McHugh.

46. In separate meetings and phone calls with Senator Harken's staff, Mr. Talbot explained
that Amtrak devoted most of its ADA funding to SOGR or other non-ADA expenditures
and that was the overriding reason why Amtrak had not made more progress toward
improving station accessibility or bringing the Amtrak system into compliance with the
ADA.

47. During the following EOC meeting, Mr. Talbot explained what was discussed with
Senator Harkin's staff. Several Amtrak executives upbraided Mr. Talbot, told him that
what he had done was "very dangerous," and forbid him from going "off message" again.
Mr. Talbot was instructed that any future statements to Senator Harken's staff or the
public must be approved by Amtrak's Office of General Counsel.

48. Additionally, in September 2011, Mr. Talbot and his wife placed a bid on a house in
Media, PA, which was a few miles from the Paoli, PA Amtrak station. Paoli, PA was
identified as "accessible" by Amtrak.

49. However, during a meeting with Amtrak, Mr. Talbot discovered in casual conversation
that Paoli, PA may not actually be accessible. Accordingly, Mr. Talbot asked the Amtrak
Law Department and other employees for clarification and learned that Paoli, PA (as well
as other stations) may be incorrectly listed on the public website (www.Amtrak.com) as
accessible.

50. Mr. Talbot visited Paoli, PA and discovered that there was a host of accessibility issues,
which included a complete lack of station-based mobile lifts and no accessible route

connecting the two side platforms. These issues made it impossible for persons with wheelchairs (and other impairments) to use the station.

51. Mr. Talbot advised the Amtrak Law Department and Amtrak Real Estate and Marketing that Paoli, PA was inaccessible and Amtrak changed its designation.

52. In addition, Mr. Talbot asked the EOC to construct two level boarding platforms (as required by the 2011 DOT rule) and an ADA-compliant path of travel between the two platforms, but the EOC flatly rejected his request.

53. Consequently, in late 2011 or early 2012, Mr. Talbot provided the Paoli, PA information to NDRN, who forwarded the information to the Disability Rights Network in Philadelphia, PA. The DRN filed a lawsuit against Amtrak in May 2012. On March 27, 2014, they reached a settlement with Amtrak, wherein Amtrak agreed to make Paoli, PA accessible.

54. In or about October 2011, Amtrak's Grant Office required Mr. Talbot to certify that the ADA budget was being spent appropriately and that Amtrak was compliant with the federal grant as required by the U.S. Department of Transportation (DOT) and the Federal Railroad Administration (FRA). When Mr. Talbot requested more information, the Grant Office told him, "Don't worry about it, just sign it, that's what everyone has done before you came to Amtrak."

55. Mr. Talbot refused to certify that Amtrak was appropriately spending the $50 million designated for ADA compliance work.[11]

56. In late 2011, Amtrak OIG's Senior Director of Audits Michael Kennedy contacted Mr. Talbot to discuss his refusal to sign the certification and the ADA program in general.

---

[11] Ultimately, Mr. Rago signed the ADA certification.

57. During their meeting, Mr. Talbot shared his initial findings on improper Amtrak spending. He also shared his work with Senator Harken's office on improving accountability within Amtrak.

58. Immediately after Mr. Kennedy left Mr. Talbot's office, Mr. Rago confronted Mr. Talbot, and interrogated him about why he was speaking with the OIG. He noted that Mr. Kennedy and Mr. Talbot had met for an extended period of time.

59. Taken aback, Mr. Talbot explained that he was trying to understand the OIG's role, his role, and how they could work together to make Amtrak more accessible.

60. Mr. Rago responded that Mr. Talbot's actions were "very risky" and that he "better be careful."

61. Shortly after his confrontation with Mr. Rago, Mr. McHugh called to ask what Mr. Talbot was doing and that he had heard that Mr. Talbot had a lengthy meeting with the OIG. Mr. McHugh warned Mr. Talbot that the OIG "could be dangerous to our efforts" and to be careful.

62. In addition, from various EOC meetings, Mr. Talbot learned that the law department and many others knew that he had met with the OIG.

63. Nevertheless, from approximately fall 2011 until fall 2014, over the course of multiple meetings and numerous lengthy conversations Mr. Talbot continued to provide the Amtrak OIG with his research and observations on Amtrak's ADA spending violations, as described below.[12]

64. In fall 2011, Mr. Talbot discovered that Amtrak was using the 1991 DOTAS for performing ADA assessments (to determine the existing ADA non-compliance) and

---

[12] Mr. Talbot's primary point of contact at the OIG was Michael Kennedy.

designing new station scope of work based on the outdated DOTAS instead of the 2006 DOTAS.

65. Accordingly, Mr. Talbot advised the EOC of the discrepancy, to which Amtrak responded by scheduling a meeting with its outside counsel on or about November 14, 2011.

66. Ultimately, Amtrak refused to use the 2006 DOTAS until October 2014, after it had already expended millions of dollars on ADA assessments and station designs, which had to be redone to comply with the updated regulations.

67. In or around November 2011, Mr. Talbot discovered that Amtrak had misclassified approximately 15 out of 25 flag stop stations.

68. Further, Amtrak used ADA funds on its flag stop stations. Amtrak used the funding to make ineffective or unnecessary changes, such as on improving a platform that could not be used by passengers with disabilities.[13]

69. For example, in late 2010, Amtrak built a concrete platform in Essex, Montana, with embedded heating coils for automatic snow clearance to replace the former asphalt platform, and also built additional lighting and fencing. Amtrak expended approximately $1.5 million of ADA funds in its endeavor. However, Amtrak failed to install a mobile lift or path of travel, which meant people with disabilities still could not board or

---

[13] The NDRN published some of Mr. Talbot's findings in October 2013 in *All Aboard (Except People with Disabilities): Amtrak's 23 Years of ADA Compliance Failure*. Specifically, NDRN's statement that "In fact, there are examples where Amtrak has increased accessibility at a station by installing a new platform or accessible parking, but then has gone back and redone the same items again at the same station with no gain in accessibility rather than making needed improvements at an inaccessible station where no work has been done[]" directly stemmed from Mr. Talbot's original research.

disembark from the train. In other words, Essex, MT remained completely inaccessible to persons with disabilities.

70. In late 2011 or early 2012, Mr. Talbot confronted Amtrak about Essex, MT, and advised them that they had used ADA funding to construct an inaccessible platform.

71. At the time, 10 of the 25 former flag stop stations were wholly inaccessible to persons with disabilities.

72. Additionally, in late 2011 Mr. Talbot discovered that Amtrak had no plans to improve stations that were served by manual station based mobile lifts. Under Mobility First, mobile lifts were constructed to allow passengers who use wheeled mobility devices to have access to Amtrak trains. Unfortunately, the station based mobile lifts were often very difficult for a passenger to use, and for some passengers who use a wheeled mobility device, the lifts may be too small.

73. Mr. Talbot asked repeatedly for Amtrak and the EOC to agree to develop a strategy that provided a level boarding type solution.

74. When Amtrak refused, Mr. Talbot provided the information to Richard Devylder (DOT), Kareem Dale (White House), Senator Harken's staff, the National Disability Rights Network (NDRN), and the Disability Rights Education and Defense Fund (DREDF) (collectively referred to as the "disability community"). He explained that a level boarding or level boarding type solution was necessary for a permanent accessibility solution, but Amtrak would only agree to use station-based mobile lifts.

75. Members of the disability advocacy community contacted Amtrak CEO Joe Boardman and requested a meeting to discuss the lack of progress to make the Amtrak system accessible and ADA compliant. The disability community complained about the station

based mobile lifts "only" strategy and the CEO assured the community that Amtrak was meeting with leadership from the DOT and Mr. Dale to propose a new Amtrak level boarding policy where Amtrak would agree to provide some type of level boarding.

76. The new level boarding policy, which became effective in 2012, states that Amtrak hopes to minimize the use of station based mobile lifts at stations where the boarding is more than 7,500/year, and that Amtrak will work to enable as close to independent access as possible for passengers with disabilities.[14]

77. In late 2011, Mr. Talbot discovered that the Washington Union Station platform at tracks 27 and 28 did not have any vertical access that passengers could use to get up or down from the mezzanine level to the downstairs boarding area. Mr. Talbot asked Amtrak Engineering and the EOC if there were plans to provide an elevator to the platform at tracks 27 and 28; he was advised that there were no such plans.

78. Mr. Talbot repeatedly asked that the EOC approve the design and construction of an elevator for the platform at tracks 27 and 28.

79. After several failed attempts, Mr. Talbot shared the lack of vertical access at tracks 27 and 28 with members of the disability community.  Members of the disability community agreed to discuss the issue during their meeting with CEO Boardman.  At the meeting, Mr. Boardman committed to the community to resolve the issue by December 31, 2014. Construction for the project began in August 2017.

---

[14] On July 23, 2015, Mr. Talbot and many members of the disability community celebrated Amtrak's first "shuttle platform," which provided level boarding at the Ann Arbor, MI station. However, since that initial launch, Amtrak has refused to deploy any additional units, as had been outlined in the 2012 level boarding policy.

80. In late 2011 or early 2012, Mr. Talbot discovered that Amtrak had been repeatedly re-working the same small number of stations—specifically, only 90 out of 525 stations. These stations, which were either owned by Amtrak or which Amtrak had the sole ADA obligation to bring the station and all elements into ADA compliance, were already accessible and serving passengers with disabilities.[15] Amtrak used ARRA funding to construct accessible elements and make the train service accessible, and then, within a couple of years, destroyed those elements to reconstruct the platform, station or accessible parking again. See, for example: Port Kent, NY; Sanford, FL; Gilman, IL. (Mr. Talbot provided a complete list of the stations at issue to Amtrak OIG.)

81. Meanwhile, stations such as Paoli, PA, Parkesburg, PA, Harpers Ferry, WV, Elko, NV, and Martinsburg, WV, were wholly inaccessible to persons with disabilities, including stations where passengers who use a wheeled mobility device could not buy tickets or access the station platforms, stations where restrooms were inaccessible, stations where the ticket counters were inaccessible, or stations where there were no accessible parking spaces.

82. Mr. Talbot believed (and disclosed) that Amtrak misspent approximately $50 million on unnecessarily rebuilding approximately 90 already accessible stations.  Moreover, despite the repeated rebuilding, the new structures remained non-compliant because Amtrak relied on the outdated 1991 DOTAS regulations, instead of the 2006 DOTAS regulations.

---

[15] Some stations may have had some ADA compliance issues, but were overall accessible.

83. Some of Mr. Talbot's disclosures, which he provided to Mr. Devylder (DOT), were published as part of the FRA's "ADA Questions and Answers":[16]

    a. OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING—WHEN DO THE REQUIREMENTS OF SECTION 37.42 BEGIN TO APPLY? (December 14, 2011) (located at https://www.fra.dot.gov/eLib/Details/L03691).

    b. OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING—WHAT CONSTITUTES AN ALTERATION TO A PLATFORM FOR PURPOSES OF TRIGGERING THE APPLICATION OF SECTION 37.42 REQUIREMENTS? (December 14, 2011) (located at https://www.fra.dot.gov/eLib/Details/L03692).

    c. OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING—IF A PLATFORM IS OWNED BY A PRIVATE ENTITY OTHER THAN THE PASSENGER RAILROAD, WHAT HAPPENS IF THE PRIVATE ENTITY OBJECTS TO THE CREATION OF A LEVEL BOARDING PLATFORM? (December 14, 2011) (located at https://www.fra.dot.gov/eLib/Details/L03693).

    d. OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING— WHERE THE TRACK ADJACENT TO A PLATFORM IS NOT SHARED WITH FREIGHT, ARE THERE ANY CIRCUMSTANCES IN WHICH AN APPROACH OTHER THAN LEVEL BOARDING IS ALLOWABLE? (December 14, 2011) (located at https://www.fra.dot.gov/eLib/Details/L03694).

    e. OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING—MUST RAILROADS SUBMIT PLANS FOR MEETING THE PERFORMANCE

---

[16] The list of Questions and Answers that Mr. Talbot worked on are located: https://www.fra.dot.gov/Page/P0175

STANDARD OF SECTION 37.42 ON A STATION-BY-STATION BASIS? (December 14, 2011) (located at https://www.fra.dot.gov/eLib/Details/L03696).

f.   OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING—WHEN A RAIL OPERATOR CONSTRUCTS A NEW STATION PLATFORM OR ALTERS AN EXISTING STATION PLATFORM, DOES 49 CFR PART 37 REQUIRE THE RAIL OPERATOR ENSURE THAT THE PLATFORM IS AT LEAST 8 INCHES ABOVE TOP OF RAIL, EVEN IF THE RAILROAD OPERATOR WILL PROVIDE ACCESSIBILITY CONSISTENT WITH THE REQUIREMENTS OF SECTION 37.42? (December 14, 2011) (located at https://www.fra.dot.gov/eLib/Details/L03689).

g.   OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING—WHAT DOES THE RULE MEAN BY "EXISTING FREIGHT OPERATIONS?" (March 9, 2012) (located at https://www.fra.dot.gov/eLib/Details/L03695).

84. Further, around summer 2012, Mr. Talbot discovered that Amtrak had improperly expended approximately $10 million in ARRA ADA and ADA funds to build completely new stations rather than simply improving the existing passenger shelter. The stations included Connellsville, PA; Trinidad, CO; Winnemucca, NV; Alliance, OH; Okeechobee, FL; and Beaumont, TX.

85. In approximately summer 2012, Mr. Talbot notified the EOC members about Amtrak's ADA program spending almost $1 million on roof replacement for the Niles, Michigan station. Mr. Talbot explained that this was an inappropriate use of funds for ADA compliance on SOGR maintenance.

86. In May 2012, Mr. Talbot discovered that Amtrak expended approximately $300,000 on its Port Kent, New York station in 2010 as part of its Mobility First program. Approximately $110,000 was spent when Amtrak installed a detectable warning[17] on the existing low level concrete platform and improved two accessible parking spaces.

87. In 2012, Amtrak removed the existing concrete platform, excavated the Mobility First funded newly improved existing platform with the detectable warning and parking areas and constructed a new concrete low-level platform and two new accessible parking spaces, in the amount of approximately $2 million. Port Kent is a seasonal Amtrak station that is only open during the summer months and serves less than 1,000 passengers per year.

88. In approximately 2012, Mr. Talbot advised the EOC that Amtrak Engineering had spent approximately $160,000 on a design package for the Michigan City, IN station that included a low-level platform, station work, and parking design. The construction was estimated to cost approximately $3.5 million. However, a 48-inch platform was required, which would have increased the budget by approximately $1 million.

89. Rather than increasing the budget to allow for the construction of an ADA-compliant high-level platform, the EOC voted to shut down the station and stop service.

90. Mr. Talbot advised the EOC that shutting down the Michigan City, IN station could also be a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, as 35% of the population it serviced are minorities.

---

[17] Detectable warning surfaces are truncated domes on a 24-inch deep edge that runs the length of a boarding platform. The dome design provides notification to a person who is blind that there is an active railway or roadway at the edge of the detectable warning.

91. Upon information and belief, Michigan City, IN still has not been shut down, nor has it been made ADA-compliant.

92. Mr. Talbot, as was his practice, conveyed many of his concerns to Mr. Devylder (DOT), some of which resulted in DOT issuing the following "ADA Questions and Answers":

   a. OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING— WHERE THE REQUIREMENTS OF SECTION 37.42 APPLY, WHICH CARS OF A TRAIN DOES A RAILROAD OPERATOR HAVE TO MAKE AVAILABLE TO PASSENGERS WITH DISABILITIES? (May 24, 2012) (located at https://www.fra.dot.gov/eLib/Details/L03697).

   b. OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING—WHAT ARE THE OBLIGATIONS OF A PUBLIC ENTITY RECEIVING FEDERAL FINANCIAL ASSISTANCE THAT OWNS AND CONTROLS TRACK THROUGH A STATION? (May 24, 2012) (located at https://www.fra.dot.gov/eLib/Details/L03690).

   c. OFFICE OF THE SEC'Y OF TRANSP., ADA & LEVEL BOARDING—WHAT ACCESSIBILITY STANDARDS APPLY TO PASSENGER RAIL CARS WHEN SPECIFIC DESIGN STANDARDS ARE NOT PROVIDED IN 49 CFR PART 38? (December 4, 2012) (located at https://www.fra.dot.gov/eLib/details/L04429).

93. In or about 2013, Mr. Talbot learned that a sizeable portion of Mobility First's spending was devoted to SOGR work or other work that was well beyond the scope of the ADA.

94. He also provided input on the FRA's March 26, 2013 Questions and Answers Concerning Wheelchairs and Bus and Rail Service. *See* https://www.fra.dot.gov/eLib/details/L04430.

95. In approximately 2014, Mr. Talbot disclosed that Amtrak had spent over $10 million on design work with a contractor, Jacobs Engineering, that could not be used, given its non-compliance with the ADA. The $10 million was taken from ADA-earmarked funds.

96. The Amtrak OIG published its report, which adopted many of Mr. Talbot's findings, on or about August 4, 2014.

97. Amtrak OIG issued its August 2014 Report to President and CEO Joseph Boardman, Vice President of Government Affairs and Corporate Communications Joseph McHugh,[18] and the EOC, which at the time comprised Eldie Acheson, General Counsel and Secretary, Francis Bourne, Chief Government Affairs, Joe Rago, Deputy Chief Engineering Construction, DJ Stadtler, Chief Operating Officer, Gerald Sokol Jr., Chief Financial Officer, Stephen Gardner, Vice President NECIID, Matt Hardison, Chief Marketing Officer, William Herrmann, Deputy General Counsel. A draft OIG report was circulated before the August 2014 publication date to the foregoing individuals.

98. Effective September 1, 2014, Amtrak Chief Operating Officer DJ Stadtler transferred Mr. Talbot from Government Affairs to the Department of Engineering. Deputy Chief Engineer Joseph Rago became Mr. Talbot's new direct supervisor. Mr. Rago had been managing all aspects of the ADA program and the ARRA ADA and ADA grant budgets during the period of time that Mr. Talbot spent uncovering serious issues with ADA spending and Amtrak's lack of ADA compliance. Mr. Rago was one of the individuals who Mr. Talbot had identified as being responsible for the misappropriated funds and misspent ADA budget.

---

[18] Mr. McHugh was also Mr. Talbot's direct supervisor at the time of the disclosure.

99. Similarly, Mr. Talbot shared some of his findings with the Department of Justice, who issued a report on or about June 9, 2015 adopting some of Mr. Talbot's original findings.

100.     In particular, the DOJ found that "Amtrak has discriminated against persons with disabilities in violation of the ADA by failing to make existing station facilities in its intercity rail transportation system, for which it is responsible, accessible. It has also violated the ADA by incorrectly classifying stations as 'flag stop' stations and thereby avoiding responsibility to make those station facilities accessible." Letter from Rebecca Bond, Chief of Disability Rights, the Department of Justice, to Joseph H. Boardman, President and Chief Executive Officer, Amtrak (June 9, 2015), https://www.ada.gov/amtrak/amtak_letter_of_findings.doc.

101.     The DOJ provided its report to CEO Boardman, as well as other EOC members and Amtrak executives.

102.     Additionally, Mr. Talbot contributed to the FRA's June 16, 2015 Questions and Answers, entitled What is the Minimum Width for Non-Level Boarding? *See* https://www.fra.dot.gov/eLib/Details/L17053.

103.     In July 2015, Jeff Sturgeon, a journalist for the Roanoke Times, contacted Mr. Talbot regarding the planned platform construction for the Roanoke, VA station. Mr. Talbot reviewed the Roanoke, VA plan, and discovered that Amtrak was building a brand new 8-inch platform adjacent to new track that was being built. Mr. Talbot advised Mr. Rago and the EOC that the platform must be a high-level platform, that is, 48-inches Above Top of Rail (ATR), because the new track would be used as a siding, which meant that freight trains would not use the new track or ride past the new passenger platform.

104.      Nevertheless, Mr. Rago asked that Mr. Talbot to sign off on the FRA Narrative for the 8-inch ATR platform, but Mr. Talbot refused. Mr. Rago said, "Here we go again."

105.      Ultimately, Mr. Rago submitted the Narrative without Mr. Talbot's signature to the FRA on behalf of the Virginia Department of Rail and Public Transportation (DRPT).

106.      However, Mr. Talbot advised Calvin Gibson, the FRA Director of Civil Rights, that he disagreed with the Amtrak's Narrative and that a 48-inch ATR platform was required. Ultimately, Director Gibson rejected Amtrak's proposal to construct an 8-inch ATR platform. Instead, Director Gibson required DRPT to construct a high level, 48-inch ATR platform, as required by the 2011 USDOT Level Boarding Rule.

107.      In November 2015, FRA notified Mr. Talbot that Amtrak Engineering had made a major platform alteration at the Rugby, ND Amtrak station without providing the required platform Narrative prior to the work being performed.

108.      As a result, Mr. Talbot checked through the Amtrak system to find out if there were any other station platforms where Amtrak Engineering had performed platform work without submitting the required narrative to the FRA prior to the start of construction.

109.      Mr. Talbot discovered Tomah, WI, where the platform had also been altered and Amtrak Engineering had not developed or submitted the narrative to the FRA as required. Mr. Talbot submitted two memorandums to Amtrak Executive and Chief Engineer Rodrigo Bitar, explaining the violated rules and the corrective actions that FRA required Amtrak to make as a result of the platform/narrative violations.  Mr. Bitar responded that he did not believe the FRA had the authority to restrict Amtrak's ability to perform work

at platforms without Amtrak first developing a narrative for each platform in question and submitting to FRA for review and approval.

110.     Amtrak's retaliation was swift and relentless. On December 30, 2015, Mr. Rago notified Mr. Talbot that he was issuing Mr. Talbot a "1" out of "4" on his performance appraisal (the lowest possible rating) and placed him on a Performance Improvement Plan (PIP).

111.     In spring 2016, Mr. Talbot reviewed Amtrak's design and budget for Union Station, Washington, D.C. Mr. Talbot rejected Amtrak's plan because it was not ADA-compliant. Amtrak designed a new 8-inch platform; however, Washington Union Station required either a 15-inch or 48-inch ATR platform to comply with the 2011 USDOT level boarding requirements.

112.     Mr. Rago asked Mr. Talbot to sign off on the FRA narrative to exempt Amtrak from the 15 or 48-inch requirement. However, Mr. Talbot refused, and told Mr. Rago that the plan to build a low-level 8-inch ATR platform was illegal.

113.     The design of the new 8-inch platform was to be completed in 2017 and construction at Union Station was scheduled to begin in approximately 2018.

114.     In or around May 2016, Mr. Rago announced his resignation from Amtrak. Before his departure, Mr. Rago advised Mr. Talbot that he should "watch his back," that "you know, they're trying to get rid of you," and that "they will do just about anything to get you out of here."

115.     Thereafter, in approximately July 2016, Ray Verrelle became Deputy Chief Engineer, and Mr. Talbot's direct supervisor.

116.     In early August 2016, NDRN asked Mr. Talbot to participate as an ADA subject matter expert in the accessibility review of Airbus's accessible lavatory in a single aisle aircraft – one of the first of its kind. The accessibility review was scheduled for August 15, 2016, from approximately midnight to 1:00 am, at the Baltimore Washington International (BWI) airport.

117.     Mr. Talbot agreed; he and his wife arranged to travel from Wilmington, DE, to BWI, and to arrive at BWI at approximately 10:00 pm on August 15, 2016. Mr. Talbot offered his services pro bono.

118.     However, at approximately 12:30 pm on August 15, 2016, Ray Verrelle emailed Mr. Talbot to advise him that a potential conflict of interest had been brought to his attention.  In speaking with Mr. Verrelle, Mr. Talbot learned that Amtrak's Law Department had flagged Mr. Talbot's relationship with NDRN as potentially presenting a conflict of interest.

119.     Yet, Amtrak regularly meets with NDRN and Mr. Talbot had frequent meetings and phone conversations with NDRN since his hire in Sept. 2011.

120.     Nevertheless, Mr. Verrelle directed Mr. Talbot to complete Amtrak's conflict of interest form 1194, which Mr. Talbot did, and in which he stated that there was no conflict of interest.

121.     On August 16, 2016, Mr. Verrelle instructed Mr. Talbot to complete a new form 1194, as "nothing to report" could not be used in his case. On August 17, 2016, Mr. Talbot submitted a revised form and extensively explained his actions, all of which were taken on his own time, at his own expense, and without any personal gain.

122.     Although Mr. Talbot requested a copy of Mr. Verrrelle's transmittal to Amtrak's Ethics Office on the matter, Mr. Verrelle never provided him with a copy.

123.     Additionally, no one has ever provided Mr. Talbot with a final determination on the alleged conflict of interest arising from his activities with NDRN.

124.     In late August 2016, Mr. Bitar called Mr. Talbot and asked him if September 5, 2016 was his last day of employment. Mr. Bitar asked Mr. Talbot whether he was planning to retire or resign on his five-year anniversary with Amtrak. Mr. Talbot responded that he had no plans to leave and that he did not have another job to go to. Mr. Bitar explained that he had other plans for the ADA program, and that Mr. Talbot was not a part of those plans. Mr. Talbot responded that he joined Amtrak to improve accessibility for persons with disabilities, and that he was not ready to leave until he had succeeded.

125.     Additionally, during the conversation, Mr. Bitar alleged that Mr. Rago had informed him that Mr. Talbot had expressed to Mr. Rago that Mr. Talbot would be departing Amtrak after completion of his five years. Mr. Talbot disputed ever expressing such a sentiment, and contacted Mr. Rago, who confirmed that he had never made any such statement to Mr. Bitar.

126.     In late August 2016, Amtrak secretly demoted Mr. Talbot. Mr. Talbot was unceremoniously advised of his demotion when he received a notice that the Engineering Department was reorganizing. The new organizational chart included with the Notice showed Mr. Talbot as a "Manager IV" instead of his position as Program Director ADA. Where his Program Director ADA position was located was a box labelled "TBD" (To Be Determined).

28

127.     Mr. Talbot contacted his former supervisor, Joe McHugh, to let him know about the new Engineering Organizational chart and his demotion to a Manager IV.  Mr. McHugh expressed surprise and advised Mr. Talbot that there must be a mistake. He suggested that Mr. Talbot request a face-to-face meeting with Mr. Verrelle and Mr. Bitar to clarify the situation.

128.     Mr. Talbot requested a meeting with his superiors. Although Mr. Verrelle and Mr. Bitar initially agreed to meet with Mr. Talbot at 1:00 pm on September 1, 2016, at approximately 1:15pm that day, Mr. Verrelle unexpectedly called Mr. Talbot to advise him that neither he nor Mr. Bitar will be attending the in-person meeting.

129.     Mr. Verrelle told Mr. Talbot that he at least deserved a phone call, explained that the new organizational chart was not a mistake, that Mr. Verrelle was confident that the new organizational chart was the right way for Amtrak Engineering to proceed, and that they were posting the position for a new Program Director ADA.

130.     In approximately mid-November 2016, Amtrak selected Lonnie Murray to be the new Program Director for ADA and Mr. Talbot's new direct supervisor. Previously, Mr. Murray had worked for Mr. Bitar at WAMATA in Washington, D.C.

131.     On December 22, 2016, Mr. Murray issued Mr. Talbot a "1" rating and, on January 12, 2017, placed him on a second PIP. Although Mr. Talbot challenged the baseless rating, Mr. Murray advised him that he was merely following Mr. Verrelle and Mr. Bitar's instructions.

132.     In February 2017, Amtrak took away Mr. Talbot's private office and instead relocated him to a cubicle. As ADA Program Director, Lonnie Murray was given the office that would have been occupied by Mr. Talbot.

133.    During this time, Mr. Talbot's right hand became numb and he started losing his ability to grip his wheelchair push rim. Mr. Talbot made an appointment with his primary care physician (PCP), and on February 24, 2017, his PCP ordered an MRI of Mr. Talbot's neck.

134.    The MRI revealed a compression on C4-C5, but he could not undergo surgery due to other medical issues. Instead, his healthcare providers attempted steroid injections on May 12, 2017, May 31, 2017, and June 23, 2017.

135.    On September 14, 2017, Mr. Talbot submitted his response to the second PIP, and explained his concerns regarding Amtrak's violations.

136.    On September 25, 2017, Mr. Talbot submitted his Statement of Material Evidence and Information with the U.S. Department of Justice.

137.    On September 27, 2017, Mr. Talbot filed his Qui Tam Complaint for Violations of the federal False Claims Act and for Unlawful Retaliation Against Relator under seal before this Court. (This court unsealed the original Complaint on October 23, 2018.)

138.    In or about late October 2017, Amtrak began pressuring Mr. Talbot to accept a Voluntary Separation Incentive Package (VSIP), under the guise of its reorganization effort.

139.    Throughout this time, Mr. Talbot's neck, shoulder, and bladder issues continued to worsen. In November 2017, Mr. Talbot's PCP referred him to his urologist, who inserted another port in his chest and began a two-week antibiotic I.V. therapy. On November 21, 2017, his healthcare providers ordered a second two-week antibiotic I.V. therapy session. However, Mr. Talbot's infection did not abate.

140.     On December 14, 2017, Mr. Talbot discussed his worsening condition with his PCP. His PCP recommended consulting with an infectious disease doctor and a neurologist regarding neck surgery.

141.     On December 15, 2017, Mr. Murray and Mr. Talbot were onboard the same Amtrak Acela to Washington, D.C.

142.     When Mr. Murray realized they were on the same train, and he told Mr. Talbot that he would come by to talk.

143.     During this conversation, Mr. Murry disclosed to Mr. Talbot that, on December 14, 2017, Amtrak executives informed him that they decided *not* to make any reductions to the ADA program as part of its reorganization, and that Mr. Talbot's position would *not* be eliminated in January 2018.  Rather, Mr. Talbot's office would be kept at its current staff level.

144.     In response, Mr. Talbot explained to Mr. Murray that he would requesting FMLA because he needed to focus on his health, that he anticipated to begin FMLA on December 29, 2017, and that he hoped to still be able to support various projects while on medical leave.

145.     On December 19, 2017, Amtrak's Office of Human Resources (HR) notified Mr. Talbot, copying Mr. Murray, that he was eligible for FMLA leave.

146.     On December 21, 2017, Mr. Talbot discovered that he received a Short-Term Incentive (STI) bonus of $7,800.

147.     On December 22, 2017, Mr. Talbot wrote to Mr. Murray to thank him for the STI bonus and reminded Mr. Murray that he would be beginning his FMLA leave on December 29, 2017.

148.      On the same day, Mr. Murray responded:

Gary,

Your passion and commitment are commendable and inspirational for the entire office. I appreciate having you on the team as we go into a period of transition with the management reorganization.

I hope you are able to relax and enjoy the holiday season with family and friends and; take the time you need to work with your doctors to improve your health and; most importantly, tame Cujo.

Merry Christmas to you and yours,

Lonnie

149.      On December 27, 2017, Mr. Talbot received his 2017 performance evaluation.

150.      Mr. Talbot received a positive evaluation and had met his supervisor's

expectations.

151.      On January 5, 2018, Amtrak HR approved Mr. Talbot's request for FMLA for

December 29, 2017 through March 22, 2018.

152.      On January 11, 2018, while Mr. Talbot was on FMLA leave, Amtrak terminated

Mr. Talbot, effective January 25, 2018.

153.      On January 12, 2018, Curtis Decker, Executive Director for the National

Disability Rights Network, wrote to Tony Coscia, Amtrak Board President:

When asked whether Gary Talbot was still employed at Amtrak , we were told yes. In fact, he was fired while we were meeting!!!!
Gary has been one of the few voices within Amtrak pushing Amtrak to do better.

We heard from Amtrak representatives that Mr. Anderson is claiming that he is aggressively complying with the mandate to make stations accessible. However, we know this is due to pressure from FRA and DOJ's Letter of Findings and negotiations based on the prospect of litigation by DOJ .

I left the meeting feeling that we were, once again, at square one with Amtrak on issues relating disability.

(typos in original).

154.    On or around April 13, 2018, Amtrak released a vacancy announcement (Sr. Program Manager; 90231461) for Mr. Talbot's former position.

155.    On July 27, 2018, Mr. Talbot submitted a complaint to the U.S. Department of Transportation Office of Inspector General (DOT OIG), identifying several federal grants and/or contracts that he believed were involved in Amtrak's misconduct.

156.    On February 22, 2019, the 210-day deadline for the DOT OIG to investigate Mr. Talbot's claims expired.

157.    As of this filing, the DOT OIG has not completed its investigation into Mr. Talbot's claims.

158.    At the relevant times described in this pleading, Amtrak acted willfully, wantonly, and with reckless disregard for the rights of others.

## STATEMENT OF CLAIMS

### Count I
### Retaliation in Violation of the National Defense Authorization Act for Fiscal Year 2013 and the American Recovery and Reinvestment Act

159.    Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

160.    Mr. Talbot reasonably believed that Amtrak had engaged in the gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, and a violation of law, rule, or regulation related to a Federal contract or grant.

33

161.    Following Mr. Talbot's vocal efforts to end Amtrak's unlawful activities, Amtrak subjected Mr. Talbot to a series of adverse actions, including a demotion, negative performance ratings, PIPs, and a hostile work environment, culminating in his removal.

162.    As a result of Amtrak's misconduct, Mr. Talbot suffered damages including, but not limited to, loss of income, pain and suffering, emotional distress, and humiliation.

163.    Mr. Talbot submitted a complaint regarding the same to the DOT OIG, which did not conclude its investigation prior to the 210-day timeframe. Thus, he has administratively exhausted his claims.

## JURY DEMAND

Plaintiff demands a jury trial on all claims triable to the jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays that this honorable Court enter a judgment which:

a)  Declares that Defendant Amtrak unlawfully retaliated against Mr. Talbot;

b)  Provides preliminary and permanent injunctive relief to restore Mr. Talbot as nearly as possible to the position he would have held if the retaliation had not occurred;

c)  Provides equitable relief to ensure that Defendant's workplaces are free from unlawful retaliation by directing Defendant to take such affirmative action as is necessary to ensure that the effects of those unlawful employment practices are eliminated and do not continue to affect employment and advancement opportunities;

d)  Reinstates Mr. Talbot with back pay, benefits, and interest;

e)  Expunges all negative information from Mr. Talbot's personnel file(s);

f)  Awards Mr. Talbot damages—to include compensatory and pecuniary damages, such as medical costs he sustained—in an amount to be determined at trial;

g) Awards Mr. Talbot his reasonable attorneys' fees and litigation costs;

h) Awards pre-judgment and post judgment interest;

i) Grants punitive damages; and

j) Grants all other relief as may be just and proper.


Respectfully submitted,

*Nina Ren*

_____

Nina Y. Ren
D.C.D. Bar No. VA001
Richard Renner
D.C.D. Bar No. OH0021
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Ave., N.W., Suite 1000
Washington, D.C. 20006
Tel: (202) 331-9260
February 25, 2019                    Attorneys for Plaintiff Gary Talbot